542 So.2d 964 (1989)
David COOK, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 68044.
Supreme Court of Florida.
April 6, 1989.
Rehearing Denied June 5, 1989.
*965 Geoffrey C. Fleck of Friend & Fleck, Sp. Asst. Public Defender, South Miami, for appellant/cross-appellee.
*966 Robert A. Butterworth, Atty. Gen., and Richard L. Polin, Asst. Atty. Gen., Miami, for appellee/cross-appellant.
PER CURIAM.
David Cook appeals his convictions of first-degree murder and his sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On August 15, 1984, Rolando and Onelia Betancourt, who worked as the midnight cleaning crew at a Burger King in South Miami, were found dead, both of single gunshot wounds to the chest. Following an anonymous tip, police brought Cook in for questioning and obtained a statement. According to this statement, Cook and two companions, Derek Harrison and Melvin Nairn, went to the Burger King to commit a robbery. They waited behind a dumpster in the back until Mr. Betancourt came out the back door and emptied the garbage. Cook then picked up Harrison's.38 caliber revolver, which was lying on the ground, followed Mr. Betancourt to the door, and pushed him inside. The door slammed shut behind them, preventing entry by Harrison and Nairn. Cook told the police that when he demanded money from the safe, Mr. Betancourt responded that he did not speak English and could not open the safe. When Cook continued to demand money, Mr. Betancourt hit him in the arm with a long metal rod and Cook shot him. Cook said he was on his way out when Mrs. Betancourt started screaming and grabbed him around his knees. He then shot her, ran out the back door, and fled with Harrison and Nairn. Cook told the police that he thought he had shot both of the victims in the arm. The physical evidence, as well as the trial testimony of Harrison and Nairn,[*] were consistent with Cook's version of the shootings.
The jury found Cook guilty of two counts of first-degree murder, two counts of attempted robbery, burglary, and unlawful possession of a firearm while engaged in a criminal offense.
Following the penalty phase of the trial, the jury recommended death for both murders. The trial court sentenced Cook to life imprisonment for the murder of Mr. Betancourt. However, the trial court imposed the death penalty for the murder of Mrs. Betancourt, finding applicable four aggravating factors and one mitigating factor.
Cook raises five issues on appeal: (1) whether the trial court erred in failing to excuse for cause two prospective jurors who stated they had difficulty understanding English; (2) whether the trial court erred in finding the aggravating circumstance of heinous, atrocious, and cruel; (3) whether the trial court erred in finding the aggravating circumstance of murder committed to avoid arrest; (4) whether the trial court erred in failing to find the two mental and emotional statutory mitigating circumstances; (5) whether the trial court's instructions during the sentencing phase, directing the jury to adhere to a "single ballot," discouraged juror deliberation and improperly compelled a premature recommendation of death. The state raises one issue on cross-appeal: whether the trial court improperly found the mitigating circumstance of no significant history of prior criminal activity.
As his first issue, Cook contends the trial judge erred when he failed to excuse for cause two prospective jurors who had expressed their inability to fully comprehend the English language. During the jury selection process, one of the prospective jurors, Mr. Sergio, volunteered that he did not think he would understand the case because of the language:
JUROR SERGIO: Your Honor, I don't think I understand this case one hundred percent because of the language. I understand quite 
This assertion was followed by a colloquy with the court. Another prospective juror, Mr. Boan, then stated that he understood only fifty percent of what he heard in English:

*967 JUROR BOAN: I have the same thing. I don't understand but fifty percent. I hear what you say, but it like you explain me because I don't know. What is doubt?
The court then questioned Mr. Boan. After further questions by counsel, Cook moved the court to excuse both Sergio and Boan for cause because of the language problem. The trial judge refused, stating that "the legal standard is whether in my judgment upon the conversations and colloquy that took place, if they have a substantial and complete understanding of English." Cook then used two of his peremptory challenges to exclude Sergio and Boan, exhausting his challenges. He requested two additional challenges but was granted only one. As a result, he was forced to accept a juror whom he otherwise would have challenged.
Cook argues that both Sergio and Boan should have been excluded on the ground that they lacked sufficient proficiency in the English language to render the fair and impartial jury service required by the sixth amendment. He contends that because the court's error forced him to exhaust his peremptory challenges, he is entitled to a new trial under Hill v. State, 477 So.2d 553 (Fla. 1985).
The state argues that the trial court's denial of appellant's challenges for cause was not an abuse of discretion. The state observes that both Sergio and Boan "responded intelligently to numerous questions, and on several occasions they indicated that they understood what was being said."
For complete understanding of this issue a lengthy recitation of the voir dire is helpful. The trial judge initially questioned Sergio as follows:
THE COURT: Are you from Cuba, sir? Are you from Cuba, sir?
JUROR SERGIO: Yes.
THE COURT: When did you come to the United States?
JUROR SERGIO: I came here many years ago. My English is just the one I picked up from the street.
THE COURT: It sounds a lot better than my Spanish.
JUROR SERGIO: That is what everybody says, but I still, you know 
THE COURT: Are you engaged in business, sir?
JUROR SERGIO: If I am what?
THE COURT: Are you in business? Do you work?
JUROR SERGIO: Oh, I work.
THE COURT: What do you do?
JUROR SERGIO: I am a cab driver.
THE COURT: Do you read the Miami Herald?

JUROR SERGIO: Sometimes I don't even have the chance to.
THE COURT: When you read the Miami Herald, do you read El Herald or the Miami Herald?

JUROR SERGIO: The Miami Herald.

THE COURT: The regular Herald?

JUROR SERGIO: The Miami Herald.

THE COURT: There are two. One is in Spanish. One is in English.
JUROR SERGIO: Yes, there are two.
THE COURT: Which one do you read?
JUROR SERGIO: Sometimes I read the Spanish one. Usually that is the one that I read.
THE COURT: Fine. In our conversation right now is there anything that you didn't understand?
JUROR SERGIO: I don't understand this case about what really happens. Whatever happened in the Burger King up there.
THE COURT: I don't want to use fancy words, but if you do, you would be what they call clairvoyant. You have not heard any of the evidence, so I cannot imagine you would understand what really the case is. If you are picked as a juror then the lawyers would be able to make opening arguments to you and the lawyers would be able to put witnesses on the stand and that is how you will understand the case.
JUROR SERGIO: Sound different now.
Defense counsel subsequently questioned Mr. Sergio:

*968 MR. CARTER: Mr. Sergio, I'm not picking on you, sir, because I have an accent myself. I don't know what kind, but I have an accent anyway.
You indicated you have a slight problem with the English language; am I correct?
JUROR SERGIO: Yes.
MR. CARTER: So far you seem to have understood everything that has been said here for the most part; is that correct?
JUROR SERGIO: So far, yes.
MR. CARTER: You know at this point that this is a case that involves first degree murder; is that correct?
JUROR SERGIO: Yes.
MR. CARTER: You have some idea in your head, from the questions that have been asked, what the ultimate consequence of first degree is; have you not?
JUROR SERGIO: Well, as far as I am concerned, first degree murder could be a premeditation or when you, like they explained, robbed somebody and as a result of that you know, somebody dies.
The court questioned Mr. Boan as follows:
THE COURT: ... How long have you lived in the United States?
JUROR BOAN: Eighteen years.
THE COURT: Are you engaged in some business?
JUROR BOAN: No. I am an inspector of an aircraft.
THE COURT: Do you work for a company or Dade County or Federal Agency?
JUROR BOAN: No, I work for a company.
THE COURT: What company?
JUROR BOAN: Rolls Royce.
THE COURT: And you inspect aviation engines made by Rolls Royce?
JUROR BOAN: Yes, sir.
THE COURT: They make them in Miami?
JUROR BOAN: Yes, sir. Five years.
THE COURT: You learn something every day. What are the details of your job? What does your inspection consist of?
JUROR BOAN: My inspection is a magniflux inspection.
THE COURT: What is that?
JUROR BOAN: It is a very long explain. Magnifluxion inspects parts for cracks or the oil and the metal.
THE COURT: Do you do this with an instrument?
JUROR BOAN: I use an instrument. I use liquid. I use magniflux machines.
THE COURT: You were trained for that job, I take it?
JUROR BOAN: Oh, yes.
THE COURT: Did you receive your training here in the United States?
JUROR BOAN: Certainly.
THE COURT: Was that a long period of training?
JUROR BOAN: Well, it is very hard for me, but I did it.
THE COURT: And the training was in English?
JUROR BOAN: Yes... .
The following colloquy transpired between defense counsel and Mr. Boan:
MR. CARTER: ... Mr. Boan?
You did not indicate you have any problem with the language, did you?
JUROR BOAN: A little bit, sir. A little bit.
MR. CARTER: The same question I posed to Mr. Sergio I will pose to you. What would your answer be?
JUROR BOAN: If you talk like that, right now, and another lawyer talk like that, I understand everything what you said.
MR. CARTER: Let me ask you this: Let us suppose, for argument's sake, that two witnesses come into the Courtroom and they spoke with what I, for lack of a better term, call "ghetto lingo."
JUROR BOAN: What?
MR. CARTER: You are lost already? English that sounds like English that should be English, but I don't know what it is. I can understand it, I can understand some of it, but I don't understand what it is. It is a very, very thick dialect. *969 Do you think you can pick it up if it were not clear English?
JUROR BOAN: Can I understand?
MR. CARTER: Could you understand?
JUROR BOAN: I don't know.
MR. CARTER: You are able to understand the English language. Would you feel comfortable sitting on a jury knowing you may or may not miss the most important thing that happened in this trial because you did not understand what was said?
JUROR BOAN: Of course not. I don't feel good if I don't understand 100 percent.
MR. CARTER: Do you think you would be able to say you would understand one hundred percent of everything that occurs here?
JUROR BOAN: Oh, yes. Of course.
MR. CARTER: You would have no problem whatsoever?
JUROR BOAN: No.
MR. CARTER: You are absolutely certain? You are certain about that?
JUROR BOAN: Repeat again. I don't understand.
MR. CARTER: Are you certain about that?
JUROR BOAN: I don't understand.
MR. CARTER: You don't understand that, do you?
JUROR BOAN: No.
MR. CARTER: That words may be used a number of times during this trial. Are you certain, are you sure, are you positive if I were to use the term "Are you certain," you wouldn't know what I was talking about, would you? You would miss the significance of that, would you not?
JUROR BOAN: Yes.
MR. CARTER: If you were on trial instead of this man being on trial, you would not want the juror to miss the significance of anything that your lawyer said, would you?
JUROR BOAN: Yes.
MR. CARTER: You have to speak up. She can't take down a nod of the head. You have to speak up.
THE COURT: I think he said yes. Please make a verbal answer.
MR. CARTER: You wouldn't want the juror to miss anything that happened that was going to help you, am I correct?
JUROR BOAN: Yes, I would like to know what happened.
MR. CARTER: So with that in mind, you wouldn't want to miss anything either, would you?
JUROR BOAN: No.
MR. CARTER: If you miss something then you have not been given a completely fair trial, right?
JUROR BOAN: Of course. Right.
MR. CARTER: Do you think you will miss a few things?
JUROR BOAN: Yes.
There is hardly any area of the law in which the trial judge is given more discretion than in ruling on challenges of jurors for cause. Appellate courts consistently recognize that the trial judge who is present during voir dire is in a far superior position to properly evaluate the responses to the questions propounded to the jurors. In fact, it has been said:
There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury.
United States v. Ploof, 464 F.2d 116, 118-19 n. 4 (2d Cir.), cert. denied sub nom. Godin v. United States, 409 U.S. 952, 93 S.Ct. 298, 34 L.Ed.2d 224 (1972). Accord United States v. Rouco, 765 F.2d 983 (11th Cir.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); United States v. Carlin, 698 F.2d 1133 (11th Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983).
Because the trial judge granted the appellant's motion for one additional challenge, appellant is entitled to have his conviction reversed only if he can show that the judge abused his discretion in refusing to excuse both jurors Sergio and Boan for cause.
*970 A careful examination of the colloquy with Mr. Sergio demonstrates that the only question to which he was not fully responsive was the one inquiring about his business. On this record it might appear that Mr. Sergio did not understand the word "business." Yet, it may be that he simply did not hear the question. Only a person who was present in the courtroom could know. In any event, when the question was rephrased, Mr. Sergio made an appropriate response.
Mr. Sergio's answers to several other questions showed a high degree of perception. His explanation of the principle of felony murder was better than that given by some lawyers. Mr. Sergio had lived in Miami many years and could not have held the job of a cab driver without the ability to comprehend English. His modesty in saying that he did not think he understood the case one hundred percent because of the language should not be seized upon to conclude that he was incompetent to serve on the jury, particularly when he later made it clear that his lack of understanding pertained to the facts of the case which had not yet been developed.
Mr. Boan had also lived in Miami for many years. He was employed in the sophisticated job of performing magniflux inspections of aviation engines. His training had been conducted in English. It is not surprising that Mr. Boan had trouble responding to the questions concerning "ghetto lingo" because they were so awkwardly worded. The colloquy concerning whether he was absolutely certain he would have no problem was interlaced with questions containing multiple negatives. In reading the cold record, it is difficult to tell whether Mr. Boan did not understand the questions because of their poor phraseology or whether he simply did not have an adequate grasp of English. The trial judge obviously believed that Mr. Boan's confusion emanated from the questioning.
With the large influx of persons of Hispanic origin, it can now be expected that many jury venires in south Florida will contain persons who do not use textbook English grammar. However, it is the ability to understand English rather than to speak it perfectly which is important. See United States v. Rouco. After an extensive colloquy, the trial judge was satisfied that Mr. Sergio and Mr. Boan had an adequate comprehension of English to serve fairly on the jury. We are in no position to say that he was wrong. Accordingly, we deny relief as to the first issue, and affirm the convictions.
Cook's next issue concerns the trial court's finding that the killing of Onelia Betancourt was especially heinous, atrocious, and cruel (the judge found the first killing did not meet the standard). We disagree that the record supports this finding. This aggravating factor generally is appropriate when the victim is tortured, either physically or emotionally, by the killer. The medical evidence showed that Mrs. Betancourt was shot once in the chest and that her death was not drawn out. The rest of the evidence, primarily from Cook's statement to police, indicated that the struggle between Cook and the Betancourts was not so long as to make Mrs. Betancourt's killing especially heinous, atrocious, or cruel.
Next Cook attacks the finding Mrs. Betancourt was killed to avoid arrest, arguing that his statement that he shot her "to keep her quiet because she was yelling and screaming" was insufficient to support the trial court's findings. We agree. The facts of the case indicate that Cook shot instinctively, not with a calculated plan to eliminate Mrs. Betancourt as a witness.
There is ample evidence to support the other aggravating factors: that the killings were committed in the course of a robbery and a burglary, that they were committed for pecuniary gain (these two merge to form one aggravating factor), and that the killing of Onelia Betancourt was committed by a person who was previously convicted of another violent felony (the murder of Rolando Betancourt). When a defendant commits two separate murders as part of one incident the second killing can be aggravated by the first. Lucas v. State, 376 So.2d 1149 (Fla. 1979). This leaves a total of two aggravating factors.
*971 Both sides attack the judge's findings as to mitigation. Cook argues that the court should have found that he was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. As proof he cites evidence that his ingestion of cocaine, marijuana, and alcohol caused him to have a diminished capacity. We have said that "[f]inding or not finding a specific mitigating circumstance applicable is within the trial court's domain, and reversal is not warranted simply because an appellant draws a different conclusion." Stano v. State, 460 So.2d 890, 894 (Fla. 1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). We see no reason to disturb the trial court's rejection of this factor, in that the record contains positive evidence that his mental capacity was not severely diminished on the night of the killings.
The state cross-appeals the judge's finding of the mitigating circumstance of no significant history of prior criminal activity. The state argues that the prior killing of Mr. Betancourt negates this mitigating factor as to Mrs. Betancourt. We recently rejected a similar argument that crimes committed contemporaneous to the subject murder may be used to negate a finding of no significant history of prior criminal activity and receded from our opinion in Ruffin v. State, 397 So.2d 277 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). Scull v. State, 533 So.2d 1137 (Fla. 1988), petition for cert. filed, (U.S. Feb. 3, 1989). The trial court properly found this mitigating factor to be applicable.
We also reject Cook's contention that the trial court reversibly erred in instructing the jury in penalty phase. Cook seizes upon language in the instructions in which the judge told the jurors to use "a single ballot on each case" to fashion an argument that the court misled the jurors into thinking they could only vote one time on each case. Our review of the record and the rest of the penalty phase instruction convinces us that reasonable jurors would not have been misled.
We affirm the judgments of guilt and the life sentence imposed for the killing of Mr. Betancourt. With respect to the murder of Mrs. Betancourt, we cannot be certain that the "reasoned judgment" of the trial court would have been the same had only two aggravating circumstances been considered. See Randolph v. State, 463 So.2d 186 (Fla. 1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985). Therefore, we remand this case to the trial court with instructions to resentence Cook for the killing of Mrs. Betancourt. There will be no need to empanel a new sentencing jury.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, J., concurs in part and dissents in part with an opinion, in which SHAW and KOGAN, JJ., concur.
BARKETT, Justice, concurring in part, dissenting in part.
I agree with the majority that appellant is entitled to a new sentencing hearing for the reasons expressed in the Court's opinion. However, I believe the trial court erred in denying appellant's motion to recuse both Juror Sergio and Juror Boan for cause and would reverse the conviction. I agree with the majority that generally the trial court has wide discretion in ruling on challenges for cause, and the court's judgment will not be disturbed unless error is manifest. I believe, however, that although the trial court has almost unlimited discretion in discharging prospective jurors,[1] its discretion in retaining jurors is not as broad. Blackwell v. State, 101 Fla. *972 997, 1009, 132 So. 468, 473 (1931); Walsingham v. State, 61 Fla. 67, 76-77, 56 So. 195, 198 (1911).
Article I, section 16 of the Florida Constitution, and the sixth amendment of the United States Constitution guarantee the criminally accused the right to a trial by an impartial jury. Carroll v. State, 139 Fla. 233, 190 So. 437 (1939); Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Fundamental to the right of an impartial jury is the requirement that jurors be "`able to comprehend and intelligently resolve the factual issues submitted to its verdict.'" State v. Berberian, 118 R.I. 413, 418, 374 A.2d 778, 781 (1977) (quoting Rabinowitz v. United States, 366 F.2d 34 (5th Cir.1966) (Coleman, J., concurring in part and dissenting in part)). See also Peters v. Kiff, 407 U.S. 493, 501, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972) (due process requires that jurors be mentally competent during trial).
In my view, the requirement of impartiality embraces any characteristic  physical, intellectual, emotional, or spiritual  that might affect a juror's ability to function as a reasonable juror.[2] Thus, a juror who does not have a sufficient grasp of English to adequately understand the proceedings is not qualified to be a competent and reasonable juror in proceedings which are conducted in English.[3] A criminal defendant in a death penalty case is entitled to twelve jurors who are capable of hearing and understanding all of the evidence and arriving at an independent judgment as to guilt or innocence.
The question is how to assess the juror's grasp of the language. I suggest that the standard should be the same as that used in gauging juror bias. Whether or not a particular juror is capable of sufficiently understanding the language in order to fairly decide the issues lies only within that juror's knowledge.
The standard in Florida for judging a juror's competency, as set forth in Singer v. State, 109 So.2d 7, 23-24 (Fla. 1959), is whether "there is a basis for any reasonable doubt as to any juror's possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced." See also Hill v. State, 477 So.2d 553 (Fla. 1985); Blackwell; Johnson v. Reynolds, 97 Fla. 591, 121 So. 793 (1929); Crosby v. State, 90 Fla. 381, 106 So. 741 (1925); Walsingham. If there is a reasonable doubt as to the qualifications of a juror challenged by an accused for cause, the defendant should be given the benefit of the doubt and the juror should be excused. Blackwell; Crosby; Walsingham.
Although there are no Florida cases involving linguistic competence, the "reasonable doubt" standard has been applied in numerous cases involving challenges for cause based upon a juror's possible bias or prejudice. See, e.g., Singer; Leon v. State, 396 So.2d 203 (Fla. 3d DCA), review denied, 407 So.2d 1106 (Fla. 1981). In these cases, the issue is raised either when the juror admits to having a bias or voir dire brings to light some fact which, in the eyes of the court or one of the parties, might preclude the juror from acting impartially. Excusal for cause is not automatic at this point, however, as jurors are not required to be completely free of prejudice. The test rather is whether the juror can discard the prejudice or opinion and be governed exclusively by the evidence. Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); Singer, 109 So.2d at 24.
Thus, once a competency question has been raised, court and counsel are free to explore further the juror's state of mind. *973 Voir dire examination may persuade the juror that he or she can lay aside the prejudice and render a fair verdict. If this occurs, the trial court must then make an objective determination of whether the juror will be able to do so. Singer, 109 So.2d at 24. If the trial judge finds that the juror can lay aside the prejudice, excusal for cause is unwarranted. If, however, the juror continues to maintain that he or she cannot be fair, the trial judge does not have the discretion to second-guess the juror's stated belief; the juror must be excused. Forcing a defendant to be judged by someone who has stated on oath that he does not believe he can be impartial is fundamentally unfair and violates the sixth amendment. See also § 913.03(10), Fla. Stat. (1987) ("formation of an opinion or impression regarding the guilt or innocence of the defendant shall not be a sufficient ground for challenging a juror if he declares and the court determines that he can render an impartial verdict according to the evidence" (emphasis supplied)).
I can discern no reason why the same standard should not apply when a juror's competency is challenged because of a language difficulty. Once a language problem has been raised, it should be incumbent upon the trial court to determine whether the juror is sufficiently proficient in English to understand what is being said at trial. If, after questioning, the juror expresses the belief that he or she will be able to understand, and the court agrees with that assessment based upon its colloquy with the juror, the court could within its discretion allow the juror to sit. If, however, the prospective juror continues to believe and maintain that a language disability will hinder performance as a juror, the court, even though it disagrees, should exclude the juror.
The view that the juror's statement should control over the judge's opinion focuses on the fact that a person's ability to comprehend the English language is peculiarly within the knowledge of that individual. See State v. Miller, 11 Kan. App. 2d 410, 722 P.2d 1131 (1986) (when dealing with a matter more within the knowledge of the juror than the court, juror's statement should control). Although a thorough voir dire examination may be illuminating, it is no substitute for a juror's honest self-assessment based upon a lifetime of experience.
Moreover, a capital trial obviously does not proceed in the same manner as voir dire. Many of the questions asked jurors on voir dire are questions they have been asked all of their lives: where they live, what they do for a living, how many children they have. A person with an English language problem may be able to respond adequately to these questions yet be unable to understand and evaluate the testimony of witnesses or follow the court's instructions. To allow someone to sit as a juror after that person has honestly advised the court that he or she potentially will misunderstand portions of the proceedings because of a language disability would be fundamentally unfair to both the defendant and the other jurors.
In this case, I believe fairness required that both challenged jurors should have been excused for cause. Although Mr. Sergio was competent enough in English to answer most of the questions asked him by the trial judge and the lawyers, the questions often had to be repeated and the answers were not always responsive to the questions. At the conclusion of voir dire, Mr. Sergio stated that he felt he had understood everything "so far," but feared he would "fail to understand some questions or words or things" during the trial. In response to defense counsel's final question, "Do you feel that you are qualified enough language-wise?" Mr. Sergio responded, "Not all the way."
Mr. Boan, like Mr. Sergio, understood and responded intelligently to some of the questions asked him. In Mr. Boan's case, however, other questions elicited confusion, obvious misunderstanding, or incoherency. Like Mr. Sergio, when the voir dire was over, Mr. Boan still believed that he would "miss a few things."
Neither Sergio nor Boan's initial reservations about their ability to follow the proceedings in English were overcome by the *974 voir dire examination. There is no indication in the record, nor did the trial court find, that Sergio and Boan were anything but totally and completely sincere in their efforts to respond to the questions posed to them. Thus, these jurors' own statements established reasonable doubt as to their capacity to render the jury service to which a criminal defendant is entitled under the state and federal constitutions and the statutory law of this state, and both should have been excused for cause.
SHAW and KOGAN, JJ., concur.
NOTES
[*] Harrison and Nairn pled guilty to two counts of second-degree murder and attempted armed robbery and received sentences of 23 and 24 years, respectively.
[1] Thus, a court may excuse a juror who, though not legally disqualified, "`might reasonably fill [one of the parties] with apprehension as to his fairness.'" Walsingham v. State, 61 Fla. 67, 77, 56 So. 195, 198 (1911) (quoting Glasgow v. Metropolitan Street R. Co., 191 Mo. 347, 356, 89 S.W. 915, 917 (1905)).
[2] This requirement is reflected in our statutory law. See §§ 913.03(2), (10), Fla. Stat. (1985) (permitting challenges for cause on grounds of mental or physical disability and impartiality).
[3] See United States v. Rouco, 765 F.2d 983, 991 (11th Cir.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); State v. Francis, 403 So.2d 680, 682-83 (La. 1981); State v. Gallegos, 88 N.M. 487, 488-89, 542 P.2d 832, 833-34, cert. denied, 89 N.M. 6, 546 P.2d 71 (1975); People v. Guzman, 125 Misc.2d 457, 478 N.Y.S.2d 455 (Sup.Ct. 1984). See also Rosales-Lopez v. United States, 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981).