964 So.2d 1278 (2007)
William Melvin WHITE, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-1613.
Supreme Court of Florida.
July 12, 2007.
Rehearing Denied September 10, 2007.
*1280 Bill Jennings, Capital Collateral Regional Counsel, Peter J. Cannon and Robert T. Strain. Assistant CCR Counsel, Middle Region, Tampa, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
William Melvin White appeals an order of the circuit court denying his motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we affirm the circuit court's denial of the motion for postconviction relief.

I. FACTS AND PROCEDURAL HISTORY
White was convicted of first-degree murder for the 1978 death of Gracie Mae Crawford. The facts of the crime, as set out in this Court's opinion on White's initial direct appeal, are as follows:
White was a member of a Kentucky chapter of the Outlaws, a motorcycle gang, but was visiting the Orlando chapter. A group of the Outlaws, accompanied by some girl friends, visited an Orlando nightclub where they met Gracie Mae Crawford. Gracie Mae accompanied some of the Outlaws back to their Orlando clubhouse. Soon after returning to the clubhouse, White retired to a bedroom with his girl friend. Sometime thereafter White was called by Richard DiMarino who stated that Crawford liked blacks and that they had to teach her a lesson. White dressed and went into the kitchen area where he joined DiMarino and Guy Ennis Smith in severely beating Crawford. Whether DiMarino or White led the assault is unclear, but one witness testified of White's hitting Crawford with his fist and knocking her to the floor. After the beating, DiMarino and White placed Crawford in the middle of the front seat of White's girl friend's car. White started driving but along the way stopped the car and DiMarino drove the car to the end of a deserted road. (The victim, *1281 White and DiMarino had done a lot of drinking that evening, but White's girl friend testified that he knew what he was doing.) After they stopped the car, DiMarino and White pulled Crawford from the car, passed her over a barbed wire fence, and laid her on the ground. White then straddled her, took out his knife, stabbed her fourteen times and slit her throat. He handed the knife to DiMarino who also cut her throat. Crawford died as a result of the wounds inflicted upon her.
While leaving the area White and DiMarino ran out of gas at the SeaWorld parking lot and were later identified by SeaWorld security guards who had given them gas. White and DiMarino went back and picked up the body of the deceased and thereafter discarded it at a different place. The body was discovered that afternoon.
White v. State, 415 So.2d 719, 719-20 (Fla. 1982). At the penalty phase, the defense presented no mitigating evidence. The jury unanimously recommended death, and the trial judge imposed a death sentence. We affirmed the conviction and sentence on appeal. Id. at 720. The United States Supreme Court denied certiorari review on November 29, 1982. White v. Florida, 459 U.S. 1055, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982).
In 1983, White filed a motion for postconviction relief. While that motion was pending in the circuit court, White filed a habeas petition with this Court, contending that he was entitled to relief as a result of Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), because the standard jury instructions given at his trial restricted mitigating circumstances to those set forth in the sentencing statute. White v. Dugger, 523 So.2d 140, 140 (Fla. 1988). We denied White's petition, stating:
On the totality of the circumstances of this case we can, and do, unhesitatingly find that the instant evidence of nonstatutory mitigating circumstances, if in fact not considered by the jury and/or the judge, would conclusively have had no effect upon the recommendation of the death sentence imposed in this case. The charge which may have limited the jury to a consideration of statutory mitigating circumstance was clearly harmless.
Id. at 141.
The circuit court then held a hearing on White's still-pending postconviction motion and denied relief on all of his claims on April 16, 1996. On appeal, we affirmed the denial of White's postconviction motion on his claims of error in the guilt phase of his trial, including that he received ineffective assistance of counsel from his guilt-phase counsel, and his claims that evidence was improperly withheld in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that false testimony was given in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). White v. State, 729 So.2d 909, 911-13 (Fla.1999).
However, we reversed White's death sentence upon reevaluating his Hitchcock claim. We explained that because White had presented additional mitigating evidence at the evidentiary hearing that was different from what he alleged in his habeas petition, he was not procedurally barred from raising this claim again on postconviction. Id. at 914 (citing Hall v. State, 541 So.2d 1125 (Fla.1989)). We explained:
At trial, defense counsel proffered no witnesses during the penalty phase but only a brief argument. In his 1988 habeas petition to this Court, appellant argued that [the] trial judge and the advisory jury failed to consider the following record nonstatutory evidence: (1) *1282 residual doubt as to appellant's guilt; (2) the complicity of a codefendant; and (3) appellant's use and consumption of alcohol on the day of the murder. We held the failure of the court and jury to consider this evidence was harmless. White, 523 So.2d at 141.
The relevant assertions in the present 3.850 motion and the evidence presented at the 3.850 hearing focused on three general areas: (1) an abusive childhood; (2) alcohol and drug dependency resulting in mental impairment; and (3) a subservient personality susceptible to the domination of others. Appellant produced his mother, sister, and stepsister. All three testified without contradiction that appellant's father was an alcoholic who frequently abused appellant both physically and emotionally. Several other witnesses testified without contradiction that appellant himself is an alcoholic. Appellant began drinking heavily at around eleven years of age when his father would take him to bars. Dr. Caddy, a forensic psychologist, testified based on the additional evidence that appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Dr. Caddy also opined that appellant's alcoholism led to significant impairment in organic mental functioning and an inability to process information in a normal manner. Finally, Dr. Caddy stated that appellant's personality was subservient in nature based on a lack of self-worth and that it was possible he committed the murder at the direction of others.
This was all relevant evidence which the sentencing court and advisory jury should have at least considered, but it was precluded from doing so.
Id. at 914. We considered the merits of White's claims and concluded that error did occur in White's penalty phase because the jury instructions were parallel to those given in Hitchcock. We found that the failure to present this evidence from the postconviction hearing was not harmless because the error had a substantial and injurious effect or influence on the sentencing jury. We remanded the case to the trial court for a new penalty phase. Id. at 915-16.
On resentencing, the jury recommended a death sentence by a ten-to-two vote. The trial judge sentenced White to death, finding four aggravators,[1] one statutory mitigator,[2] and nine nonstatutory mitigators.[3]State v. White, No. CR78-1840 *1283 (Fla. 9th Cir. Ct. order dated April 20, 2000) (hereinafter Sentencing Order).[4]
White appealed to this Court, raising five issues.[5]White v. State, 817 So.2d 799, 803 (Fla.2002). We rejected each of White's claims on appeal and affirmed his sentence of death. The United States Supreme Court thereafter denied White's petition for a writ of certiorari. White v. Florida, 537 U.S. 1091, 123 S.Ct. 699, 154 L.Ed.2d 638 (2002).
White filed a rule 3.851 motion for postconviction relief on December 16, 2003, raising twelve claims.[6] The circuit court granted an evidentiary hearing on the second part of claim five in the motion, and the hearing was held on June 23, 2005. At the hearing, White presented the testimony of his resentencing attorneys, Chandler Muller and Bryan Park. Following the hearing, the circuit court denied all of White's postconviction motion claims. State v. White, No. 48-1978-CF-001840-O (Fla. 9th Cir. Ct. order filed Aug. 5, 2005) (Postconviction Order). White appeals that denial to this Court, raising nine issues.[7]

*1284 II. ANALYSIS OF POSTCONVICTION ISSUES
White argues that the circuit court erred in denying his postconviction motion. Finding no error in the circuit court's conclusion that White's guilt-phase claims are procedurally barred, we affirm the circuit court's denial of those claims.[8] White compares his case to Hitchcock v. State, No. SC03-2203 (Fla. order filed May 3, 2005), in which the circuit court found Hitchcock's postconviction guilt-phase claims were procedurally barred. On appeal, this Court remanded the case with instructions for the circuit court to consider the merits of all guilt-phase claims raised in Hitchcock's rule 3.850 motion for postconviction relief. However, unlike the situation in Hitchcock, this Court considered and denied White's guilt-phase claims in his previous motion for postconviction relief. White, 729 So.2d at 916. In Hitchcock, the defendant had not had the opportunity to ever fully pursue his guilt-phase postconviction claims. Therefore, we find that the circuit court properly held that the guilt-phase claims in the instant case were procedurally barred. We deny the remainder of White's claims on their merits, as discussed below.

A. Newly Discovered Evidence
White asserts that newly discovered evidence would have resulted in his acquittal had it been presented at trial. This evidence, as alleged in White's postconviction motion, is the statement of Frank Marasa, a member of the Outlaws motorcycle gang at the time of the victim's murder, that he was told by Richard DiMarino on the day after the murder that DiMarino "had to get rid of a girl last night."
The circuit court summarily denied this claim, finding it to be procedurally barred. Postconviction Order at 4. The circuit court noted that White had "failed to specifically explain why his proposed witness, Frank Marasa, could not have been discovered by diligent efforts either prior to trial, in preparation of his 1983 postconviction motion, or through an amendment to his 1983 postconviction motion." Postconviction Order at 5. The circuit court also denied the claim because it found that White could not prevail on either prong of the newly discovered evidence test.
While White's guilt-phase claims are procedurally barred, newly discovered evidence claims may be raised in successive postconviction motions. Fla. R.Crim. P. 3.851(d)(2)(A). Claims in successive motions may be denied without an evidentiary hearing "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief." Fla. R.Crim. P. 3.851(f)(5)(B).
In considering newly discovered evidence claims, we have set forth the following standard:
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the *1285 defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998). Newly discovered evidence satisfies the second prong of the Jones test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)).
Diaz v. State, 945 So.2d 1136, 1145 (Fla. 2006).
The circuit court found that White failed to set out sufficient allegations in his postconviction motion to meet either prong of this test. We agree with the circuit court's following conclusions:
White, however, has failed to specifically explain why his proposed witness, Frank Marasa, could not have been discovered by diligent efforts either prior to trial, in preparation of his 1983 postconviction motion, or through an amendment to his 1983 postconviction motion. . . .
. . . Additionally, White has failed to demonstrate that the evidence is of such a nature that it would probably produce an acquittal upon retrial. At the 1978 trial, Richard DiMarino testified that he helped take the victim out to the deserted area where she was killed, that he helped put her over a fence, and that he cut her throat. Therefore it was clear to the guilt phase jury that Richard DiMarino murdered the victim. Mr. DiMarino's alleged statement to Frank Marasa the day after the murder that "he had to get rid of a girl last night," was not inconsistent with his testimony and does [not] exculpate White.
Postconviction Order at 5 (citation and footnote omitted).
We agree that this alleged evidence cannot meet either prong of the newly discovered evidence test. We therefore affirm the circuit court's summary denial of this newly discovered evidence claim.

B. Ineffective Assistance of Resentencing Counsel
White argues that his resentencing counsel was ineffective for (1) failing to call Joseph Watts to testify; (2) failing to call John DiMarino to testify; (3) failing to properly challenge the admission of White's plea to second-degree murder in Tennessee; (4) failing to present testimony that would have mitigated against the Tennessee charge; (5) agreeing to excuse for cause a prospective juror solely because English was not her primary language; and (6) not fully exploring the racial issues in the case with a prospective juror during voir dire.
To establish a claim of ineffective assistance of counsel, a defendant must first show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney's performance is deficient when it falls below an objective standard of reasonableness under prevailing professional norms. Id. at 688, 104 S.Ct. 2052. Second, the defendant must show that counsel's deficiency prejudiced the defendant, which occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims are mixed questions of law and fact. We review the legal issues under a de novo standard of review. The circuit court's factual determinations are given deference if they are supported by competent, substantial evidence.
*1286 First, White alleges that resentencing counsel should have called Joseph Watts, a member of the Outlaws motorcycle gang, to testify before the resentencing jury. Watts testified at the Spencer[9] hearing, and there is no allegation that this testimony was not representative of the testimony Watts would have given had he been called to testify before the jury. Watts's testimony at the Spencer hearing was essentially that DiMarino confessed to Watts that he killed Crawford and did not indicate that White was involved in the murder.
While the circuit court did not grant an evidentiary hearing on this specific claim, resentencing counsel Chandler Muller did make a reference to Watts during his evidentiary hearing testimony. Muller stated that he did not want to call many members of the Outlaws motorcycle gang because he did not want the resentencing jury to associate the defendant with the gang members. He mentioned that he did not want to call Watts in particular because he was "totally unpredictable and uncontrollable."
The circuit court summarily denied this claim, in part because Watts's testimony "would have been consistent with Richard DiMarino's testimony and cumulative to the other evidence." Postconviction Order at 7. On initial postconviction motions, an evidentiary hearing should be granted on any claims listed by the defendant as requiring a factual determination. Fla. R.Crim. P. 3.851(f)(5)(A)(i). However, we agree with the circuit court that Watts's testimony is consistent with DiMarino's testimony at the guilt and resentencing phases of White's trial. DiMarino testified that he took part in Crawford's murder. At no point did Watts testify that DiMarino stated that White did not participate in the murder or that White did not inflict the fatal wound and other wounds which led the trial court to find the HAC aggravator.
Given this record evidence, we affirm the circuit court's summary denial of this postconviction claim. Our confidence in the resentencing outcome is not undermined by the absence of Watts's testimony before the resentencing jury because the alleged testimony did not contradict DiMarino's testimony and because Watts was described by defense counsel as unpredictable and uncontrollable. Thus, we affirm the circuit court's denial of this claim.
White next argues that resentencing counsel was ineffective for failing to call John DiMarino, Richard DiMarino's brother, to testify at the resentencing. The circuit court summarily denied this claim, finding that John DiMarino's testimony was presented to the resentencing jury when his testimony from White's original guilt and penalty phases was read into the record. Postconviction Order at 9. The circuit court noted that resentencing counsel was unable to locate John DiMarino at the time of the resentencing.
At resentencing, the defense called Carrie Farney, a licensed private investigator. Farney testified that after several attempts, he was unable to locate John DiMarino for the resentencing. Based on this testimony, the resentencing court found John DiMarino to be unavailable and permitted his testimony from White's 1978 trial to be read to the jury. A defendant cannot establish ineffective assistance of counsel based on counsel's failure to call a witness who is unavailable. Melton v. State, 949 So.2d 994, 1004 (Fla. 2006), petition for cert. filed, No. 06-11339, ___ U.S. ___, ___ S.Ct. ___, ___ L.Ed.2d ___ (U.S. May 15, 2007). We therefore affirm the circuit court's summary denial of this claim.
*1287 The basis for White's next claims involves his plea to second-degree murder in Tennessee following his 1978 conviction in the instant case. At the resentencing, the State introduced the transcript of the March 4, 1980, Tennessee plea colloquy to support the aggravating factor that White was previously convicted of another felony involving the use or threat of violence. At that proceeding, White pled guilty to second-degree murder. White argues that resentencing counsel was ineffective for failing to properly challenge the introduction of this prior conviction. White also argues that resentencing counsel should have presented the testimony of White's Tennessee codefendant, Michael Markham, because this testimony would have mitigated White's involvement in the Tennessee offense. To the extent that White raises a substantive claim that his rights were violated because of the introduction of this Tennessee conviction, that claim is procedurally barred and should have been raised on direct appeal of the resentencing. Lamarca v. State, 931 So.2d 838, 851 n. 8 (Fla.2006).
White argues that the plea colloquy indicates that White did not knowingly, intelligently, and voluntarily waive his right to trial and that no factual basis supports White's plea. The circuit court summarily denied this claim, finding that based upon the record, there was no valid basis for counsel to attack the plea or conviction. Postconviction Order at 9.
At the plea hearing, the Tennessee court read the facts of the investigation into the record and asked questions of White in an attempt to determine whether the guilty plea was made knowingly, voluntarily, and intelligently. We affirm the circuit court's finding that resentencing counsel was not ineffective because resentencing counsel had no basis for objecting to the introduction of this evidence. See Rogers v. State, 957 So.2d 538, 32 Fla. L. Weekly S263, S265 (Fla. Jan. 18, 2007) ("Because none of the closing arguments were improper, counsel cannot be deemed ineffective in failing to object to them.").
White also argues that trial counsel was ineffective for failing to present to the resentencing jury the testimony of White's codefendant in the Tennessee homicide case, Michael Markham. Markham did testify at the Spencer hearing. He stated that he committed the Tennessee homicide and that while White was present, White did not participate in the killing and only assisted Markham in getting rid of the body. This subclaim was the one item on which the circuit court held an evidentiary hearing.
At the evidentiary hearing, resentencing counsel Muller testified that he was aware of the Tennessee plea and that he investigated the circumstances of the plea as well as Markham's testimony. He stated that his focus at resentencing was to present the mitigating circumstances of White's terrible childhood and that he "didn't want to focus on" the Tennessee homicide. He also stated that he met with Markham, who told him that he alone shot the Tennessee victim. However, Muller pointed out that the autopsy report conflicted with Markham's testimony because it did not reflect that the victim received any gunshot wounds, only stabbing wounds, and so Muller "did not want the jury to see [Markham]." Muller admitted that there were some questions as to the validity of the autopsy report. Muller explained:
I found [Markham] credible for purposes of, you know, doing what I felt was the best thing to do to try to save Mr. White's life with the judge. I don't have an independent recollection. I didn't do a memo and I would have made this hearing earlier saying I'm *1288 deciding not to call Mr. Markham in front of the jury because of "X."
. . . .
But I know there were  I was worried about him. I have to say the reason I didn't call Mr. Markham, something bothered me and I can't, you know  my best recollection is that it was because he was going to get up there and say he shot this guy and that there was the plea colloquy. And my focus in the case was all of the stuff that Mr. White went through in his life and, you know, the other evidence that we presented at the trial.
So I would say that I wanted the Judge to hear what he had to say, but I didn't want the jury to.
Co-resentencing counsel Bryan Park further explained that Markham was concerned about having to answer questions that were unrelated to the Tennessee murder and that he was concerned about being badgered on cross-examination. He also set forth:
[The defense] need[s] to have as much jury appeal as possible. And the more Outlaws, we thought, would take the witness stand in front of a jury, the more of a danger of hurting the credibility of our case, because the Outlaws, they were not good people, and Mr. White was an Outlaw. And we didn't  if you put on too many Outlaw witnesses, there was the chance of him getting dirty just by association.
The circuit court denied this claim, finding that "counsel's decision not to present the testimony of Mr. Markham to the penalty-phase jury, but to instead present his testimony at the Spencer hearing, was a reasonable trial strategy." Postconviction Order at 12. The circuit court also found that Markham's testimony was not credible because it was contradicted by the autopsy report and by his plea. Id.
We find that the circuit court's determination that resentencing counsel made a reasonable, tactical decision not to call Markham before the jury is supported by competent, substantial evidence. Muller testified that he did not think Markham would make a good witness because his testimony conflicted with the autopsy report and his plea. In addition, Muller testified that he wanted to focus on other mitigating evidence about White and not on this crime. The record reveals that Markham came to Florida to testify and so was available if Muller determined that Markham was needed. After a full investigation, Muller ultimately decided not to present Markham's testimony to the jury. Thus, this case is distinguishable from Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In Rompilla, trial counsel admitted that she did not investigate the defendant's prior violent felony record, which would have revealed a great deal of mitigating evidence that she could have used on the defendant's behalf at the penalty phase. In the instant case, trial counsel ultimately made a strategic decision after a full investigation not to present Markham's testimony at resentencing. "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (quoting State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987)).
Thus, we affirm the circuit court's determination that counsel was not ineffective for failing to call Markham. See Lamarca, 931 So.2d at 849 (reasonable trial strategy for counsel not to call persons who were not credible and would not have made good defense witnesses).
Next, White asserts that resentencing counsel was ineffective for failing to object and agreeing to the excusal for *1289 cause of a prospective juror due to the juror's difficulties understanding English. During voir dire, the prospective juror indicated that she felt life in prison was a more severe punishment than a death sentence. In answer to the prosecutor's more specific questions, she stated that her feelings would interfere with her ability to participate in the recommendation and that she did not think she could recommend the death penalty. Defense counsel and the trial court attempted to rehabilitate her, and the following exchange occurred:
THE COURT: Could you stand by your convictions?
PROSPECTIVE JUROR: Yes, ma'am. Maybe I can act according to the law.
THE COURT: I'm sorry?
PROSPECTIVE JUROR: Is acting according to the law. But I'm a Christian, Christian person. What I read in the Bible, that's what I've been, that's what I've been thinking about it, you know.
MR. MULLER: When you say what you read in the Bible 
PROSPECTIVE JUROR: That's what I've been thinking my beliefs would be because one of the commandments is thou should not kill somebody. This guy killed somebody. The law here in this world is different. Right, you kill, we have to kill you. That's it. Do you understand what I mean?
. . . .
MR. MULLER: That's not the law. If a person kills another person the law doesn't say we just kill the person that killed the other person. That's not what the law says. The law says, the judge is going to read you the law if you're on the jury, there are certain circumstances where you would recommend to the judge that the death penalty be imposed. But the state would have to prove those circumstances beyond every reasonable doubt. The defense gets to put things on about Mr. White that you would weigh against those other circumstances.
Would it, does that make sense?
PROSPECTIVE JUROR: I don't understand what you said.
MR. MULLER: This is, we feel bad about  you understand we're not trying to pick on you?
PROSPECTIVE JUROR: No, I know.
MR. MULLER: Let me ask you this, ma'am: would, do you feel the language barrier is such that, like you were talking about it there when people start talking and everything, and like we're doing right now, it would make it hard for you to be on the jury?
PROSPECTIVE JUROR: Yes, it is hard for me.
MR. MULLER: Do you think it would be so hard that 
PROSPECTIVE JUROR: I don't feel comfortable.
MR. MULLER: Does your level of not feeling comfortable, is it so bad you just don't think you could be fair under any circumstance?
PROSPECTIVE JUROR: I don't know. I don't feel comfortable because this gets me nervous.
The prosecutor moved to have the prospective juror removed for cause because "she said her feelings about the death penalty would interfere with her ability to follow your instructions. She also said that she wasn't comfortable and had problems understanding." Defense counsel agreed, and the prospective juror was excused.
White argues that this prospective juror was improperly excused solely because of *1290 her problems understanding English and that trial counsel was ineffective for failing to object to her excusal for cause. The circuit court summarily denied this claim, finding that, based on the record, the challenge was proper and that counsel's performance was not deficient. Postconviction Order at 14.
We agree with the circuit court that counsel was not ineffective because the prospective juror clearly stated on the record that she did not think that she could follow the law were she to serve on the jury. Even counsel's attempts to rehabilitate her were unsuccessful, because she never clearly stated that she could follow the law  at most she said "maybe" she could. A juror is considered competent if the juror can "lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court." Ault v. State, 866 So.2d 674, 683 (Fla.2003). We have held that a trial court has great discretion when deciding whether a challenge based on juror incompetency is improper, and this decision will not be overturned absent manifest error. Id. Indeed, in affirming the trial judge's denial of the defense motion for excusal for cause of prospective jurors because they did not understand English, we stated:
There is hardly any area of the law in which the trial judge is given more discretion than in ruling on challenges of jurors for cause. Appellate courts consistently recognize that the trial judge who is present during voir dire is in a far superior position to properly evaluate the responses to the questions propounded to the jurors.
Cook v. State, 542 So.2d 964, 969 (Fla. 1989).
The trial judge and the attorneys were in the best position to determine whether the prospective juror would be able to follow the law. Therefore, we affirm the circuit court's summary denial of this claim. To the extent that White raises a substantive claim on this juror's excusal, that claim is procedurally barred because it should have been raised on direct appeal. Morris v. State, 931 So.2d 821, 832 n. 12 (Fla.2006).
In his final claim, White asserts that his resentencing counsel was ineffective for failing during voir dire to fully question an African-American man who eventually served as a juror at White's resentencing to ensure that the race issue in this case would not improperly bias him. This race issue concerns Richard DiMarino's testimony setting forth that Crawford was beaten and ultimately killed because she seemed attracted to an African-American man. The circuit court summarily denied White's claim, finding that "[t]he possibility of there being a racial aspect to some of the evidence was covered with [the juror] during voir dire." Postconviction Order at 16.
The following exchange occurred during voir dire:
MR. MULLER: Okay. Let me ask you this question: There are certain things that are right at the core of our being. And if there was evidence that in the whole circumstance of this situation in 1978 that there were racial undertones in this homicide involving blacks and whites, would that factor cause you to think oh, my gosh, and it would substantially affect your ability to apply the law as the judge instructs?
JUROR: Not a racial situation.
MR. MULLER: Please understand, sir, I'm not trying to 
JUROR: Yes, sir. I mean 
MR. MULLER: Question number 27 under political identification, you put other. Can you tell me about that?
*1291 We affirm the summary denial of this claim. The record shows that the juror was questioned and given an opportunity to respond as to whether the racial issue would affect his ability to apply the law. He responded that it would not. Thus, counsel's performance was not deficient because the juror was asked whether this racial overtone to the case would affect his impartiality, and the juror responded that it would not.
Moreover, White failed to sufficiently allege that the juror actually was biased and thus failed to sufficiently allege any prejudice in his postconviction motion. See Davis v. State, 928 So.2d 1089, 1117 (Fla.2005) ("[E]ven if we were to conclude that this failure rendered trial counsel's performance deficient, Davis has failed to demonstrate how this prejudiced these proceedings. Davis has not provided evidence that any unqualified juror served in this case, that any juror was biased or had an animus toward the mentally ill or persons suffering from drug addiction."), cert. dismissed, 547 U.S. 1053, 126 S.Ct. 1649, 164 L.Ed.2d 357, and cert. denied, ___ U.S. ___, 127 S.Ct. 206, 166 L.Ed.2d 166 (2006). We agree with the circuit court's holding that the facts set out in the record show that no error occurred, and therefore, we affirm the denial of this claim.

III. CONCLUSION
For these reasons, we affirm the denial of the postconviction motion.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The aggravating factors were: (1) White had been convicted of a prior violent felony; (2) the murder was committed while White was engaged in a kidnapping; (3) the murder was heinous, atrocious, or cruel (HAC); and (4) the murder was committed to disrupt or hinder the enforcement of laws.
[2] The statutory mitigating factor was that the murder was committed while White was under the influence of an extreme mental or emotional disturbance, and the sentencing judge accorded this factor little weight.
[3] The nonstatutory mitigating factors were that White: (1) had a poor family background and an abusive childhood, lived in squalor, and suffered from parental neglect (accorded some weight); (2) had an extensive history of alcohol and substance abuse from an early age (accorded some weight); (3) suffered from organic brain damage and neurological deficiencies (accorded some weight); (4) had marginal intelligence and a low IQ (accorded little weight); (5) was intoxicated and had diminished capacity when he committed the crime (accorded very little weight); (6) was a willing worker and good employee (accorded some weight); (7) lacked future dangerousness, had the potential to be rehabilitated, and had a good prison record (accorded some weight); (8) contributed to the community (accorded very little weight); and (9) was a loving person and was generous to others (accorded very little weight).
[4] Following White's original conviction and sentence in the instant case, he pled guilty in 1980 to a second-degree murder charge in Tennessee. White was sentenced to thirty years and that Tennessee plea was used at White's Florida resentencing to establish the prior violent felony aggravator.
[5] On direct appeal of his resentencing, White argued that: (1) the trial court erred in not permitting the cross-examination of a key State witness concerning the underlying facts of the witness's subsequent murder conviction; (2) the trial court erred in finding that the murder was committed to disrupt or hinder the enforcement of laws; (3) the trial court erred in rejecting the statutory mitigating factor that the murder was committed while White was under extreme duress or under the substantial domination of another; (4) the imposition of the death penalty is disproportionate; and (5) White's execution, after serving more than twenty-two years on death row, will constitute cruel and unusual punishment.
[6] The claims raised by White in his initial motion were: (1) newly discovered evidence exculpated White and made him ineligible for the death penalty; (2) guilt-phase counsel was ineffective for failing to call Joseph Watts as a witness; (3) resentencing counsel was ineffective for failing to call Watts as a witness; (4) resentencing counsel was ineffective for failing to call John DiMarino as a witness; (5) White's rights were violated, and resentencing counsel was ineffective for failing to properly challenge or mitigate the admission of White's prior Tennessee conviction; (6) the State offered false testimony at the guilt phase; (7) resentencing counsel was ineffective for agreeing to strike a prospective juror for cause simply because English was not her primary language; (8) White was denied equal protection when a prospective juror was struck for cause simply because English was not her primary language; (9) resentencing counsel was ineffective for failing to preserve and file a motion for rehearing on the trial court's clear error as to one of White's proposed mitigators; (10) resentencing counsel was ineffective for failing to more thoroughly question or raise a for-cause challenge to a juror; (11) jury instructions were in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (12) Florida's sentencing scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[7] In his appeal to this Court, White argues that: (1) the newly discovered evidence of Frank Marasa's statement regarding the murder exculpates White of first-degree murder; (2) guilt-phase counsel was ineffective for failing to call Joseph Watts to testify; (3) resentencing counsel was ineffective for failing to call Joseph Watts to testify; (4) resentencing counsel was ineffective for failing to call John DiMarino to testify; (5) evidence of White's guilty plea to a Tennessee murder was improperly admitted, and resentencing counsel was ineffective for failing to properly challenge the admission of this plea or present testimony that would have mitigated against this testimony; (6) the State submitted false testimony at White's guilt phase; (7) resentencing counsel was ineffective for agreeing to excuse for cause a prospective juror solely because English was not her primary language; (8) White was denied equal protection because a prospective juror was excused for cause solely because English was not her primary language; and (9) resentencing counsel was ineffective for not fully exploring the racial issues in the case with a juror during voir dire.
[8] We conclude that the following claims are procedurally barred and we reject White's arguments that they were improperly summarily denied by the circuit court: (1) White's guilt-phase counsel was ineffective for failing to call Joseph Watts to testify; and (2) the State submitted false testimony at the guilt phase in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[9] Spencer v. State, 615 So.2d 688 (Fla.1993).