PER CURIAM.
 

 Alex Pagan appeals an order of the trial court denying his motion to vacate his convictions of first-degree murder and sentences of death filed under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the trial court’s denial of postconviction relief and deny the petition for habeas relief.
 

 FACTS AND PROCEDURAL HISTORY
 

 Alex Pagan was convicted of two counts of first-degree murder in the 1993 deaths of six-year-old Michael Lynn and his father Freddy Jones, two counts of attempted murder of the child’s mother Latasha Jones and the Joneses’ eighteen-month-old son Lafayette Jones. Pagan was also convicted of armed robbery and armed burglary for breaking into the Joneses Bro-ward County home and taking their Jeep Cherokee.
 
 Pagan v. State,
 
 830 So.2d 792 (Fla.2002).
 

 Latasha Jones testified that two men
 
 [1]
 
 entered the master bedroom of the Joneses’ home in the early morning hours by crashing through the sliding glass doors. The two men demanded money from the couple. One of the intruders stated that he had messed up the “first time” and now wanted a large amount of cash that he believed was in the house. The intruders were wearing ski masks, but at one point Latasha was able to see one of the men whose mask was partially off. Latasha described him as “very bright skinned, looked like he was white” and as being “the calm one” of the two perpetrators. She described the other man as being hyper. Latasha also testified that “the calm one” tied up the couple and shot the victims.
 

 Latasha testified that that the couple’s house had been burglarized approximately one month earlier. Clothes, jewelry, and cash had been taken. Latasha identified some items of jewelry that were recovered from Pagan’s residence after he was arrested for the murders. Other items of the Joneses’ jewelry had been taken to two pawn shops by Graham.
 

 Antonio Quezada and Keith Jackson, friends of the defendants Pagan and Graham, testified that they saw both men wearing the jewelry identified by Latasha as having been stolen in the first burglary. Quezada testified that Pagan told him “the next time they would do it right.” Queza-da also testified that he drove the defendants to the Joneses’ home on the night of the murders and that Pagan stated that they would kill everybody. Pagan arrived at Quezada’s apartment later that night and stated that he had killed everyone, including the children. He also admitted that he had stolen the Joneses’ car and abandoned it at a supermarket.
 

 Keith Jackson testified that Pagan admitted that he had committed the home
 
 *944
 
 invasion murders. Pagan also told Jackson that he had targeted the Joneses’ home because Freddy Jones was a drug dealer and was reputed to have money in his home. Pagan admitted his participation in the first burglary and showed Jackson the gold jewelry he had taken. Pagan showed him the house he had burglarized and stated his intention to go back because he had not gotten all of the money that was supposed to be in the house. After the murders, Pagan admitted to Jackson that he had shot everyone in the house, had dismantled the gun and scattered it over Miami, and had shot the victims because he thought they had seen his face.
 

 During the penalty phase, the State presented evidence of Pagan’s prior criminal record, which included a sexual assault and two aggravated batteries. Pagan’s mitigation witnesses included family members and friends who testified about his childhood and upbringing, a records supervisor with the Broward County Sheriffs Office who testified about his exemplary prison record, and an attorney who testified about his cooperation in his defense. The jury recommended a death sentence by a vote of seven to five.
 

 At the
 
 Spencer
 
 hearing,
 
 [2]
 
 a forensic psychologist testified that Pagan has a borderline personality disorder and suffered from attention deficit disorder as a child. The State presented another forensic psychologist who disputed both findings. The defense also presented testimony from other family members and friends about Pagan’s family relationships.
 

 The trial court followed the jury’s recommendation and imposed death sentences for each murder. The trial court found three aggravating circumstances; Pagan had a prior violent felony conviction; the murders were committed during the course of a felony; and the murders were committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court found as a statutory mitigating circumstance, under the catch-all provision of “any other factors,” that Pagan had a deprived childhood based on his father’s abandonment of the family when he was two years old and his mother’s having to raise two small children on her own. The trial court also found several nonstatutory mitigating circumstances, including that Pagan suffered from attention deficit disorder, had a borderline personality disorder, was a loving brother, was a loving grandson and great-grandson, was a loving friend, and disjolayed good conduct while in custody.
 

 On appeal, Pagan raised seventeen claims.
 
 [3]
 
 This Court found all but one of
 
 *945
 
 Pagan’s claims of error to be meritless, not properly preserved for appeal, or not argued with specificity. The only error found by this Court (the prosecutor’s reference to “Desert Storm” without a factual basis in the evidence) was deemed harmless.
 
 Pagan,
 
 880 So.2d at 813. We affirmed Pagan’s convictions and sentences.
 
 Id.
 
 at 817. The United States Supreme Court subsequently denied Pagan’s petition for writ of certiorari.
 
 See Pagan v. State,
 
 539 U.S. 919, 123 S.Ct. 2278, 156 L.Ed.2d 137 (2003).
 

 Pagan filed a postconviction motion in June 2004, raising twenty-one claims. In January 2005, the trial court issued an order granting Pagan an evidentiary hearing on four of his claims.
 
 [4]
 
 The trial court denied all relief in February 2006.
 

 Pagan has appealed the denial of post-conviction relief to this Court, raising nine issues. Pagan asserts that (1) the State committed a Brady
 
 [5]
 
 violation by suppressing evidence in a police report about the identity of an alternate suspect; (2) defense counsel provided ineffective assistance by failing to ensure that Pagan received a proper mental health examination, to conduct a proper investigation of mitigation, and to present mitigation evidence properly; (3) defense counsel provided ineffective assistance by failing to call witnesses who could mitigate the facts underlying the prior violent felony aggravator; (4) the trial court erred in summarily denying a
 
 Brady
 
 claim relating to Keith Jackson’s plea in a different case; (5) the trial court erred in summarily denying a Giglio
 
 [6]
 
 claim relating to Keith Jackson’s testimony about charges against him in Dade County; (6) the trial court erred in summarily denying a claim of ineffective assistance of counsel relating to Wanda Jackson’s testimony; (7) the trial court erred in summarily denying claims of confrontation violations and prosecutorial misconduct relating to the testimony of Keith Jackson and Wanda Jackson; (8) the trial court erred in summarily denying a claim of ineffective assistance of counsel regarding the cross-examination of Detective Ron Peluso; and (9) the trial court erred in summarily denying a claim of ineffective
 
 *946
 
 assistance of counsel regarding the cross-examination of Keith Jackson. Pagan has also filed a petition for writ of habeas corpus, raising two issues. He claims that (1) he was denied equal protection when prospective jurors were struck from his jury because English was not their primary language; and (2) he was denied a reliable sentence and verdict because the jury’s role was diminished in violation of
 
 Caldwell v.
 
 Mississippi,
 
 [7]
 
 We address Pagan’s claims in turn below.
 

 POSTCONVICTION APPEAL
 

 The first three claims that Pagan raises in his postconviction appeal were the subject of a three-day evidentiary hearing by the trial court in February 2005.
 
 [8]
 
 At the hearing, Pagan presented testimony from his guilt phase attorney Dennis Colleran, his penalty-phase attorney Kenneth Mal-nik, his friend Philip Howard regarding the facts underlying the prior felony conviction aggravator, his grandmother Viola Miranda and his father Miguel Pagan about his childhood and family relationships, and clinical psychologists Henry Dee and Mark Cunningham.
 

 Brady
 
 Violation
 

 Pagan claims that the State committed a
 
 Brady
 
 violation by suppressing the identity of an alternate suspect referred to in a police report. The trial court denied relief on this claim, finding that this alleged
 
 Brady
 
 evidence was available to Pagan prior to and at the time of trial. The court noted that defense counsel had used the identity “mix up” in a motion to suppress, in a motion for new trial, and in argument to the jury. Thus, the court concluded, there was no
 
 Brady
 
 violation. The trial court further concluded that even if this was
 
 Brady
 
 material, it would not have undermined confidence in the outcome of Pagan’s trial proceedings.
 

 Pursuant to
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State is required to disclose material information within its possession or control that is favorable to the defense.
 
 See Mordenti v. State,
 
 894 So.2d 161, 168 (Fla.2004). To establish a
 
 Brady
 
 violation, the defendant has the burden to show (1) that favorable evidence-either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict.
 
 See Stridden,
 
 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 
 See Way,
 
 760 So.2d at 913;
 
 see also Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936. The remedy of retrial for the State’s suppression of evidence favorable to the defense is available when “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936 (quoting
 
 Kyles v. Whitley,
 
 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Giving deference to the trial court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of the
 
 *947
 
 suppressed evidence.
 
 See Mordenti,
 
 894 So.2d at 169;
 
 Way,
 
 760 So.2d at 913.
 

 At the evidentiary hearing, Pagan’s guilt phase counsel Dennis Colleran testified that the theory of defense was that Pagan had not been involved in the crimes and that Keith Jackson had implicated Pagan to remove suspicion from himself and his associates. The record shows that Col-leran filed a number of pretrial motions, including motions to suppress the physical evidence found in Pagan’s house and to suppress various witness statements. Col-leran testified that he never received the Miramar Police Department Information Sheet, dated April 2, 1993. This information sheet involved Pagan’s codefendant Willie Graham and Graham’s attempts to hire someone to kill the police detective investigating the instant case. Included on the information sheet was a statement that “Graham has [a] known associate Alex Ramirez who resides in Turtle Bay.”
 

 In his statements to the police about the instant crime, Keith Jackson related that Willie Graham and his friend “Alex” had admitted their involvement in the house invasion and murders. Jackson did not know Alex’s last name, but was able to give accurate information about where Alex lived, which was Pagan’s residence, and he identified Alex as having been released from prison recently, which Pagan had been. Jackson stated that Alex’s last name could be Ramirez. Thus, this was the name listed on the search and arrest warrants relating to Pagan.
 

 Colleran testified that had he received the Miramar information sheet mentioning an Alex Ramirez who lived at Turtle Bay, he could have more thoroughly investigated Ramirez and his connection to Jackson and Graham. Colleran also testified that he could have used the information sheet to attack the credibility of the police investigation and to impeach Jackson. Colleran testified that had he received this information sheet, it would have “put [him] on a much heavier harder trail against Ramirez” and he would have been able to argue his motions “more strongly” with this information.
 

 However, Colleran admitted that long-before trial he realized that Ramirez was a real person and not an alias for Pagan or misleading information provided by Jackson. Included in the discovery materials received by Colleran in July 1993 were employment records listing Alex Ramirez as working with Willie Graham. Colleran had also hired an investigator to investigate Alex Ramirez and his connection to Jackson or Graham in July 1993. In August 1995, Colleran hired another investigator to speak to Alex Ramirez. Colleran admitted that he had previously obtained a report showing that Alex Ramirez had no criminal record and he considered Ramirez as a possible witness against Jackson’s alibi. Colleran described Ramirez as a “straight shooter who wouldn’t be somebody under [Keith] Jackson’s control.”
 

 On cross-examination, Colleran admitted that he had used the name mix-up to his strategic advantage in the motions to suppress, arguing that the warrants were defective because they did not have Pagan’s actual name but instead referred to Alex Ramirez. In a motion for a new trial in August 1997, Colleran continued to argue that there was no Alex Ramirez and that Jackson had lied to the police, even though Colleran knew at the time that Alex Ramirez was an actual person who was acquainted with codeiendant Graham.
 

 Thus, the fact that there was a real person named Alex Ramirez who was associated with Willie Graham and Keith Jackson was not suppressed by the State, because the defense had this information as early as July 1993, used this information
 
 *948
 
 to argue various motions to the court, and even investigated this individual. If the evidence in question was known to the defense, it cannot constitute
 
 Brady
 
 material. Thus, a
 
 Brady
 
 claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it; the evidence simply cannot then be found to have been withheld from the defendant.
 
 See Occhicone v. State,
 
 768 So.2d 1037, 1042 (Fla.2000). Pagan has not established a
 
 Brady
 
 violation.
 

 Ineffective Assistance Claim Regarding Mitigation Evidence
 

 In his second issue on appeal, Pagan asserts that his trial counsel rendered ineffective assistance in regard to mitigation evidence in three respects. First, Pagan claims that penalty-phase counsel Kenneth Malnik failed to ensure that he received a proper mental health evaluation because defense mental health expert Dr. Martha Jacobson did not explore possible organic brain damage and because Malnik did not present Dr. Jacobson’s testimony to the jury but only to the court during the
 
 Spencer
 
 hearing. Second, Pagan claims that Malnik failed to conduct a proper investigation of potential mitigation to uncover many mitigating factors that could have been presented to the jury. Third, Pagan claims that Malnik failed to present the mitigation evidence in a proper way because both parties and the court referred to criminal responsibility rather than moral culpability in evaluating the mitigating evidence.
 

 At the evidentiary hearing, Pagan presented testimony from penalty-phase counsel Malnik about his preparation, investigation, and presentation of mitigating evidence, from Pagan’s father Miguel Pagan about the family history of substance abuse, from Pagan’s grandmother Viola Miranda that no psychologist or lawyer ever interviewed her prior to the penalty phase, from neuropsychologist Dr. Hemy Dee about the results of his postconviction evaluation and testing of Pagan, and from psychologist Dr. Mark Cunningham about extensive mitigating evidence from Pagan’s childhood, family, and background.
 

 After the evidentiary hearing, the trial court denied relief on this claim, finding that Pagan had not shown deficient performance. The court further concluded that even if the evidence that Pagan referenced in the evidentiary hearing had been presented, it would not have changed the outcome of the proceedings because Pagan did not challenge the aggravating factors, which the court had found “standing alone” to be “sufficient to outweigh the mitigating circumstances.” The trial court summarized Malnik’s investigation and preparation for the penalty phase and discussed his strategic reason for not presenting Dr. Jacobson’s testimony to the jury. The court also noted that although the postconviction mental health experts expressed different opinions about Pagan’s mental condition and a new approach for presenting his family history to the jury, this did not show deficient performance by counsel.
 

 Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2062, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
 

 First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence
 
 *949
 
 in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
 

 Maxwell v. Wainwright,
 
 490 So.2d 927, 932 (Fla.1986) (citations omitted). Where this Court previously has rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument.
 
 See Heath v. State,
 
 3 So.3d 1017, 1033 (Fla.2009).
 

 Because both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the trial court’s factual findings that are supported by competent, substantial evidence, but reviewing the trial court’s legal conclusions de novo.
 
 See Scchor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 There is a strong presumption that trial counsel’s performance was not ineffective.
 
 See Strickland,
 
 466 U.S. at 690, 104 S.Ct. 2052. “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.”
 
 Id.
 
 at 689, 104 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.”
 
 Id.
 
 In
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000), this Court held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 

 With respect to the investigation and presentation of mitigation evidence, the Supreme Court observed in
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), that
 
 “Strickland
 
 does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does
 
 Strickland
 
 require defense counsel to present mitigating evidence at sentencing in every case.”
 
 Id.
 
 at 533, 123 S.Ct. 2527. Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel’s decision not to introduce certain mitigation evidence was itself reasonable.
 
 Id.
 
 at 523, 123 S.Ct. 2527;
 
 Strickland,
 
 466 U.S. at 690-91, 104 S.Ct. 2052. When making this assessment, “a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.”
 
 Wiggins,
 
 539 U.S. at 527, 123 S.Ct. 2527.
 

 An attorney can almost always be second-guessed for not doing more. However, this is not the standard by which counsel’s performance is to be evaluated under
 
 Strickland.
 
 Deficient performance involves “particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards.”
 
 Maxwell,
 
 490 So.2d at 932. Here, Malnik reviewed the records and evaluations that he inherited from Pagan’s previous counsel, consulted with previous counsel and the previous mental health expert who had evaluated Pagan, conduct
 
 *950
 
 ed his own investigation by obtaining school records and jail records, interviewed Pagan, interviewed Pagan’s family and friends, obtained the appointment of Dr. Jacobson to conduct a mental health evaluation of Pagan, consulted with Dr. Jacobson, and reviewed Pagan’s criminal records. Malnik made a strategic decision not to present Dr. Jacobson’s testimony to the jury and only to the judge at the
 
 Spencer
 
 hearing based on factors learned during the course of his investigation. Malnik explained that Dr. Jacobson’s diagnosis of Attention Deficit Disorder (ADD) was not consistent with the nature of the crime and would not “necessarily explain the crime to a jury” as it might to a scientist or psychologist. Additionally, Malnik learned during depositions that the State mental health expert would contradict the diagnoses of ADD and borderline personality disorder and would present damaging evidence that Pagan had an antisocial personality disorder and had been involved with gangs and guns. He knew that the school records and anecdotal information from friends and family did not support the ADD diagnosis. Furthermore, Malnik knew that Dr. Jacobson did not find any statutory mental health miti-gators. “Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected.”
 
 White v. State,
 
 964 So.2d 1278, 1288 (Fla.2007) (quoting
 
 Rutherford v. State,
 
 727 So.2d 216, 223 (Fla.1998)).
 

 Based on the mitigating evidence that Malnik presented at the penalty phase and the
 
 Spencer
 
 hearing, the sentencing court found both ADD and borderline personality disorder as nonstatutory mitigating circumstances and childhood deprivation as a statutory mitigating circumstance under the catch-all provision of section 921.141, Florida Statutes (1997).
 
 [9]
 
 Moreover, much of the family information that Dr. Cunningham presented in his postconviction testimony was actually presented to the jury during Pagan’s penalty phase. Finally, any claim that the court applied an incorrect standard in evaluating the mitigating evidence is procedurally barred because it was not raised on direct appeal.
 
 See Harvey v. Dugger,
 
 656 So.2d 1253, 1256 (Fla.1995) (“[Tissues that could have been, but were not, raised on direct appeal are not cognizable through collateral attack.”). Accordingly, we affirm the trial court’s denial of this ineffective assistance of counsel claim.
 

 Prior Violent Felony Aggravator
 

 Pagan next asserts counsel provided ineffective assistance by failing to call witnesses who could mitigate the facts underlying the prior violent felony aggravator. The sentencing order found the prior violent felony aggravator based on Pagan’s convictions for five violent felonies — indecent assault, two counts of aggravated battery with a deadly weapon, and the attempted murders of Latasha Jones and her infant son — and the contemporaneous capital felony convictions for the murders of Freddy Jones and Michael Lynn. The indecent assault conviction is the basis of Pagan’s claim of ineffective assistance of counsel here.
 

 The indecent assault occurred when Pagan was nineteen years old and involved the thirteen-year-old sister of a friend, who reportedly had a “crush” on Pagan and was always hanging around him. When a group of Pagan’s friends went to a festival in Miami, the young girl went over to Pagan’s house. Pagan could not accompany his friends to the festival because he
 
 *951
 
 was on house arrest. Pagan and the girl began kissing. The girl stated that it went too far and Pagan would not stop when she said no. Pagan stated that it was a consensual sexual encounter. Pagan was convicted of indecent assault.
 

 The trial court conducted an evi-dentiary hearing on this claim. Penalty-phase counsel Malnik was questioned about his handling of this prior conviction aggravator and one of Pagan’s high school friends testified about his recollection of the matter. Malnik testified that he reviewed the files for all of Pagan’s prior convictions and was familiar with the facts of the indecent assault conviction and the statements made in the case. Malnik testified that he did not want to bring in witnesses regarding this incident because he did not want to highlight the assault or make it a focus of the case. However, after the State brought out the details of the incident, Malnik was able to admit Pagan’s complete statement to the police asserting that this was a consensual sexual contact, which was somewhat exculpatory to Pagan. Malnik was also able to keep the jury from learning that the victim had been a virgin and that Pagan had pled guilty to the assault.
 

 At the evidentiary hearing, Pagan’s high school friend Philip Howard testified about his recollection of the events surrounding the indecent assault conviction. Howard testified that the victim had a crush on Pagan and considered him her “boyfriend.” Howard also testified that the victim became angry and jealous when Pagan dated a girl his own age and threatened to get even with Pagan and that she made inconsistent statements about what had occurred on the evening in question. However, Howard also testified that the victim was upset and crying the day after the incident. Psychologist Dr. Mark Cunningham testified that the indecent assault conviction could have been mitigated with information that Pagan had been repeatedly sexually abused by older women beginning when he was ten years old and continuing throughout his childhood.
 

 The trial court denied relief on this claim, finding that counsel made a strategic decision and was not deficient in his performance. Based on the testimony presented at the evidentiary hearing, we agree. Further, even if counsel had presented Howard’s testimony at the penalty phase and been able to mitigate the circumstances of the indecent assault conviction, Pagan cannot prove prejudice by counsel’s failure to do so. The prior violent felony aggravator did not rest solely on this conviction for indecent assault. It was supported by several other more violent convictions. Thus, we affirm the trial court’s denial of relief on this claim because Pagan has failed to demonstrate deficient performance and prejudice.
 

 The remainder of Pagan’s claims on appeal assert that the trial court erred by summarily denying a number of his postconviction claims. As a general proposition, a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient.
 
 See, e.g., Maharaj v. State,
 
 684 So.2d 726 (Fla.1996);
 
 Anderson v. State,
 
 627 So.2d 1170 (Fla.1993); Fla. R.Crim. P. 3.850. The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden.
 
 See Kennedy v. State,
 
 547 So.2d 912 (Fla.1989). However, in cases where there has been no eviden-tiary hearing, the reviewing court must accept the factual allegations made by the defendant to the extent that they are not
 
 *952
 
 refuted by the record.
 
 See Peede v. State,
 
 748 So.2d 253 (Fla.1999);
 
 Valle v. State,
 
 705 So.2d 1331 (Fla.1997). This Court must examine the claim to determine if it is legally sufficient, and, if so, determine whether or not the claim is refuted by the record. We review Pagan’s claims that were summarily denied in this context.
 

 Claims Relating to State Witness Keith Jackson
 

 Pagan asserts that the trial court should have granted him an evidentiary hearing on several claims relating to State witness Keith Jackson, including an alleged
 
 Brady
 
 violation regarding Jackson’s plea in an unrelated Dade County case, an alleged Giglio
 
 [10]
 
 violation relating to Jackson’s trial testimony about the Dade County case, and a claim of ineffective assistance of counsel in the cross-examination of Jackson. For the reasons explained below, we conclude that the trial court’s summary denial of each of these claims was proper.
 

 Pagan claims that the State committed a
 
 Brady
 
 violation by withholding information about the terms of Jackson’s plea
 
 agreement
 
 in the Dade case, documentation of Jackson’s performance of the terms of that agreement, and violations of the agreement that had not led to any charges being brought or sanctions imposed against Jackson. Pagan also claims that this evidence was material to his effective impeachment of Jackson’s testimony. The trial court found that Pagan did not establish a
 
 Brady
 
 violation because the evidence of Jackson’s murder charge in Dade County was not suppressed. The court’s order cites extensive pretrial and trial record references to Jackson’s Dade case. The court also concluded that the claim was legally insufficient because Pagan did not plead what “favorable evidence” was allegedly withheld.
 

 We agree with the trial court. The State did not suppress the fact that Jackson had entered into a plea agreement in the Dade case and the nature of that agreement, i.e., Jackson was promised a reduced sentence in return for his testimony against the other codefendants in that case. The record of Pagan’s trial is replete with motions, evidence, testimony, and argument regarding Jackson’s Dade case. Thus, the real thrust of Pagan’s claim is that there is some undisclosed documentation of Jackson’s performance of that agreement which may indicate that he violated the terms of the agreement.
 

 Although the “due diligence” requirement is absent from the Supreme Court’s most recent formulation of the
 
 Brady
 
 test, it continues to follow that a
 
 Brady
 
 claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant.
 

 Occhicone v. State,
 
 768 So.2d 1037, 1042 (Fla.2000). Here, the State disclosed that Jackson had entered into a plea agreement in the Dade case, outlined the parameters of the agreement, stated the sentencing range that Jackson faced, and disclosed the name of the judge who was presiding over Jackson’s case. In fact, Pagan’s counsel filed a notice of reciprocal discovery with a number of attached documents that he had obtained from the Dade County file of Jackson’s case.
 
 Cf. Way v. State,
 
 760 So.2d 903, 911-12 (Fla.2000) (noting that evidence is not “suppressed” where the defendant was aware of the exculpatory information). Thus, we question whether any information was actually suppressed and, thus, whether Pagan stated a legally sufficient claim as to the second prong of
 
 Brady.
 

 
 *953
 
 However, even if information relating to the terms of Jackson’s plea agreement could be considered suppressed, Pagan cannot meet the third prong of a
 
 Brady
 
 violation on this claim, i.e., the defendant was prejudiced because the evidence was material.
 
 Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way,
 
 760 So.2d at 910. To meet this prong, the defendant must demonstrate a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome, that had the suppressed evidence been disclosed the jury would have reached a different verdict.
 
 See Strickler,
 
 527 U.S. at 289-90, 119 S.Ct. 1936. Pagan was able to present significant impeachment of Jackson’s character and credibility by eliciting that Jackson had been charged with attempted first-degree murder in an unrelated case and had agreed to testify against his codefendants in exchange for a more lenient sentence. Any additional information about Jackson’s performance of the plea requirements would only be more impeachment and our confidence in the outcome of the trial is not undermined.
 
 See Guzman v. State,
 
 868 So.2d 498, 508 (Fla.2003) (rejecting
 
 Brady
 
 claim on the materiality prong in light of the significant impeachment of the witness without the disclosure of payment of a reward).
 

 Pagan also asserts that the State presented false and misleading information regarding the status of Jackson’s Dade case in violation of
 
 Giglio.
 
 Specifically, Pagan asserts that the State knew that the charges had been reinstated against Jackson in the Dade case a year before Jackson’s testimony in Pagan’s trial, yet Jackson testified that the charges had only recently been reinstated. Pagan asserts that the State did not want the jury to know that Jackson had entered a plea agreement in that case in exchange for his testimony in that case. Pagan also contends that the State did not want the jury to know the specifics of that case: that Jackson had been charged with attempted murder in an incident in which drugs had been stolen; had kidnapped and attempted to execute the victim in the case with a firearm; had been arrested with two other codefendants; and had entered into a plea agreement in exchange for his testimony against the codefendants. Pagan acknowledges that the State gave notice of Jackson’s deal through supplemental discovery, but contends that the full extent of the deal was not revealed. The trial court found this claim to be legally insufficient as pled because Pagan’s claim was conclu-sory and he presented no argument or analysis regarding the materiality of the testimony presented. The court also noted that Jackson’s plea deal and the underlying charges were thoroughly discussed during the trial.
 

 A
 
 Giglio
 
 claim requires proof that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.
 
 See Guzman v. State,
 
 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict.
 
 Id.
 
 Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt.
 
 Id.
 
 at 1050-51;
 
 see also Mordenti v. State,
 
 894 So.2d 161, 175 (Fla.2004).
 
 Giglio
 
 claims present mixed questions of law and fact.
 
 Sochor v. State,
 
 883 So.2d 766, 785 (Fla.2004). A reviewing court defers to those factual findings supported by competent, substantial evidence, but reviews de novo the application of the law to the facts.
 
 Id.
 

 
 *954
 
 In June 1994, Pagan filed a motion in limine to introduce evidence of the Dade charges as reverse Williams
 
 [11]
 
 rule evidence against Jackson and to use this information to impeach him. However, because the Dade charges had been dropped against Jackson at that time, the court ruled that Pagan could not present this evidence. In May 1996, the State gave notice to Pagan through supplemental discovery that Jackson had been rearrested on the Dade charges, that Jackson had entered a plea agreement in exchange for cooperating with the State, that Jackson faced a sentence ranging from five years’ probation to ten years in prison, and identified the judge who would preside over this case. In November 1996, Pagan filed another motion in limine to cross-examine Jackson about his rearrest on the Dade charges, the nature of that crime, and the sentence that Jackson could receive. At the hearing on the motion, the State acknowledged that Jackson had been rearrested and had made a deal with the State and that Pagan had a right to question Jackson about these matters. Pagan’s counsel also discussed the particulars of the Dade case against Jackson, including that Jackson and Willie Graham shot a drug dealer in the head, inflicting a nonfatal wound, in order to steal his money, that this crime had led the police to Jackson as a possible suspect in the instant case, and that Jackson had given the police information about who committed the instant crimes.
 

 During Jackson’s trial testimony, the prosecutor asked him about his arrest in the Dade case and the status of the charges against him. Jackson testified that he had been arrested in February 1992 with Graham and another individual for a crime in Dade County and that the charges had been dropped after eight months, but had been reinstated in 1996.
 
 [12]
 
 Jackson admitted that he had entered a plea agreement in exchange for his testimony in the Dade case and was awaiting sentencing, which could range from five years’ probation to ten years in prison. During cross-examination of Jackson, Pagan’s counsel elicited that Jackson and Graham had been arrested for attempted first-degree murder in the Dade case, that Jackson had been aware that the dropped charges were going to be reinstated against him at the time of his initial questioning in this case, and that Jackson had been incarcerated for eight months on those charges.
 

 Essentially, Pagan contends that a
 
 Giglio
 
 violation occurred when Jackson testified on direct examination that he had been rearrested in 1996 on the Dade charges and the State did not clarify or correct that he had actually been rearrested in 1995. False evidence is deemed material under
 
 Giglio
 
 if there is any reasonable possibility that it could have affected the jury’s verdict.
 
 Guzman,
 
 941 So.2d at 1050. In other words, false testimony is not material if it was harmless beyond a reasonable doubt.
 
 Id.
 
 at 1051. We conclude that this error as to the date charges were reinstated against Jackson was harmless beyond a reasonable doubt. The jury was fully aware of the charges against Jackson, the nature of the crime involved, that Graham was Jackson’s code-fendant in that case, that Jackson had entered into a plea agreement requiring him to testify against his codefendants in another case, and the range of possible sentences he faced. Further, Pagan was not prevented from fully discussing or exploring this issue at trial.
 

 
 *955
 
 Pagan also asserts that trial counsel rendered ineffective assistance relating to his cross-examination of Jackson. Pagan’s argument to this Court on this point is very brief, and consists almost entirely of a direct quote of his postconviction motion below. In that motion he argued that trial counsel was ineffective in failing to argue that Keith Jackson had actually committed this offense and in failing to question Jackson about his attack on another individual, his drug dealing activities, and his relationship with four individuals (Eric Miller, Anthony Graham, Daryl Featherstone, and Dee Dee Mosley). Pagan’s only explanation of the significance of these alleged omissions is a one-sentence argument that he was prejudiced by the failure to impeach Jackson, the State’s main witness, and by the failure to show that Jackson had motive and ability to commit the offenses that were the basis of Pagan’s convictions.
 

 In its order denying relief, the trial court found this claim to be legally insufficient because Pagan did not explain how linking Jackson to these four individuals would further his defense. Further, the trial court stated that the record shows that counsel did what Pagan alleges he failed to do, i.e., he brought out the facts of Jackson’s Dade county case, pointing out that Jackson had motive and ability to commit these crimes, and pointing out Jackson’s relationship with Miller, Graham and Mosley. The court acknowledged that defense counsel did not address Jackson’s relationship with Featherstone, but noted that Pagan did not show how a discussion of Featherstone was important to his defense or how he was prejudiced by this omission.
 

 This Court encourages trial courts to hold evidentiary hearings on postconviction motions. However, when a motion lacks sufficient factual allegations or the alleged facts do not render the judgment vulnerable to collateral attack, a motion may be summarily denied.
 
 See Ragsdale v. State,
 
 720 So.2d 203, 207 (Fla.1998). A hearing is warranted on an ineffective assistance of counsel claim only where a defendant alleges specific facts, not conclusively rebutted by the record, which demonstrate a deficiency in counsel’s performance that prejudiced the defendant.
 
 Id.; Cherry v. State,
 
 659 So.2d 1069 (Fla.1995). A summary or conclusory allegation is insufficient to require the trial court to examine the specific allegations against the record.
 

 Pagan offers no explanation of the significance of linking Jackson to the four individuals listed or what Jackson’s attack on the other individual involved. Thus, the trial court properly concluded that this part of Pagan’s claim was legally insufficient and no hearing was required. The legal sufficiency of the remainder of this claim is also tenuous. However, Pagan at least hits the high points of why the cross-examination and impeachment of Jackson was important; he alleges Jackson was one of the State’s main witnesses against Pagan and that he had motive and opportunity to commit this offense. However, as the trial court concluded and the State points out in its brief to this Court, Pagan’s counsel actually performed the tasks that Pagan claims were omitted. Counsel pointed out that Jackson had been charged with attempted first-degree murder in Dade County along with Graham and had been offered a plea deal, that Jackson feared he would be charged in the instant case, that Jackson had a motive to lie about Pagan’s involvement in the instant crimes, that Jackson fit the physical description of one of the assailants given by the surviving victim, Latasha Jones, that Jackson’s alibi was not solid and that there were inconsistencies in Jackson’s state-
 
 *956
 
 merits. Counsel also elicited information about the personal connections between Jackson and Miller,
 
 [13]
 
 Mosley,
 
 [14]
 
 and Graham.
 
 [15]
 
 Because the record refutes Pagan’s claims that counsel failed to question or impeach Jackson, counsel’s performance was not deficient and no evidentiary hearing was required on this claim.
 

 Accordingly, we conclude that Pagan is not entitled to relief on any of these claims relating to Keith Jackson, and we affirm the trial court’s summary denial of the claims.
 

 Summary Denial of Other Claims
 

 Pagan claims that the trial court erred in summarily denying two other claims of ineffective assistance, both of which involve Wanda Jackson’s deposition in which she related statements made to her by her husband Keith Jackson about the crimes committed in this case. Pagan also alleges confrontation and prosecutorial misconduct claims based on Wanda’s deposition testimony. Pagan contends that counsel was ineffective for failing to introduce Wanda’s deposition at trial because the jury was prevented from hearing the statements attributable to Keith and because Wanda’s testimony could have been used to contradict the testimony of Detective Ron Pelu-so. Pagan also claims that he was denied his right to confront witnesses when defense counsel failed to cross-examine Keith or Wanda about these statements and that the State committed prosecutorial misconduct by directing Keith to invoke the marital privilege regarding these statements. For the reasons explained below, we conclude that the trial court’s summary denial of these claims was proper.
 

 The State filed a motion in limine to exclude Wanda Jackson’s testimony about statements that Keith Jackson had made to her. The State argued that the testimony was inadmissible hearsay and was covered by the marital privilege in section 90.504, Florida Statutes.
 
 [16]
 
 Keith had invoked the marital privilege to exclude Wanda’s testimony during Willie Graham’s earlier trial for the same crimes at issue here. When the State sought a ruling on its motion prior to voir dire questioning in Pagan’s trial, the court stated that it would not rule on the motion or conduct a hearing on the issue until Keith invoked the marital privilege to exclude Wanda’s testimony. The State brought up the motion in limine again prior to opening statements, but the court reiterated that it would not discuss the issue until the witness was being called to testify. Pagan ultimately decided not to put on a defense case and thus never called Wanda as a witness. In response to the judge’s questioning, Pagan stated that he was in agreement with the decision not to put on a defense case.
 

 Pagan claims that counsel was ineffective in failing to present Wanda’s testimony about the statements made by Keith. The trial court concluded that Pagan had
 
 *957
 
 not established that counsel’s performance was deficient because he did not show that Wanda’s deposition was taken pursuant to Florida Rule of Criminal Procedure 3.190(j), which is the only way that the deposition would have been admissible as substantive evidence. The court explained that if Wanda’s deposition was not admissible, counsel could not be deemed deficient for failing to seek its admission. The court also concluded that Pagan had not proven the prejudice prong required for an ineffective assistance of counsel claim.
 

 Based on the record cited above, it is clear that the trial court never ruled on the State’s motion in limine regarding marital privilege or the admissibility of Wanda’s deposition testimony. Pagan cannot now complain about counsel’s failure to present this evidence when he specifically agreed at trial with the decision not to put on a defense case. Moreover, Pagan has not asserted how he was prejudiced by this decision. Thus, we affirm the trial court’s summary denial of this claim.
 

 Pagan also asserts that trial counsel was ineffective in his cross-examination of Detective Ron Peluso because counsel did not impeach the detective with allegedly contradictory statements in Wanda’s deposition testimony. In his brief to this Court, Pagan cites his motion to vacate below without elaborating on this claim. As we explained in
 
 Duest v. Dugger,
 
 555 So.2d 849, 852 (Fla.1990),
 

 The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.
 

 Thus, we find the claim waived and do not address it.
 

 Finally, Pagan asserts that he was denied his confrontation rights when his counsel failed to cross-examine Keith or question Wanda about the statements made by Keith. He also claims that the State committed prosecutorial misconduct by directing Keith Jackson to invoke the marital privilege regarding these statements. Pagan does not elaborate on how his confrontation rights were violated or why the State’s motion in limine constituted misconduct. He asserts that the marital privilege did not apply to Keith Jackson’s statements because the couple was estranged at the time the statements were made.
 

 The trial court denied the confrontation claim as legally insufficient, conclusory, and involving alleged trial error that should have been raised on direct appeal. The court also noted that Pagan had not demonstrated how the statements could have been admitted through a hearsay exception. The trial court denied the misconduct claim as moot because there was no record evidence that the State had successfully invoked the marital privilege at trial and the issue was never fully addressed because Wanda Jackson was never offered as a witness.
 

 We conclude that neither aspect of this claim involves an actual issue. Had Pagan attempted to introduce Wanda Jackson’s testimony or deposition and been prevented from doing so, he could argue that he was prevented from presenting a witness, albeit such a claim is properly raised on direct appeal. However, Pagan never met the threshold of putting it at issue because he never offered Wanda as a witness or attempted to introduce her deposition testimony, a strategic decision that Pagan specifically agreed with.
 

 As to the claim of prosecutorial misconduct, Pagan seems to be claiming that marital privilege did not apply to
 
 *958
 
 these statements and the prosecutor’s filing of the motion in limine invoking the privilege was tantamount to misconduct. However, as noted above, there is a marital privilege for confidential communications made between spouses while they are husband and wife. See § 90.504, Fla. Stat. (2007). The privilege continues after the marital relationship ends as long as the communications were made during the marital relationship. Either party can invoke the privilege and refuse to disclose or prevent another from disclosing those communications. This privilege does not apply where the spouses are involved in proceedings against each other or one spouse is charged with a crime committed against the other spouse’s person or property or that of a child of either. Whether the communication occurred while the two were husband and wife would be a determination for the court. In the instant case, the State filed a motion in limine claiming that the privilege applied. The court never ruled on the motion because the statements in question were never sought to be admitted. In his motion to vacate, Pagan asserted that the privilege did not apply because the marriage between Wanda and Keith was “defunct” at the time the statements were made. It appears that this legal argument is the basis upon which Pagan asserts prosecuto-rial misconduct. However, prosecutorial misconduct cannot be based on a good faith argument that a statutorily recognized privilege applies. Further, as the trial court found below, there is no record evidence that the marital privilege was successfully invoked at trial here. Thus, we affirm the trial court’s summary denial of this claim.
 

 HABEAS PETITION
 

 Pagan has also filed a petition for writ of habeas corpus with this Court, raising two issues. Pagan claims that (1) he was denied equal protection when prospective jurors were struck from his jury because English was not their primary language; and (2) he was denied a reliable sentence and verdict because the jury’s role was diminished in violation of
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
 

 Pagan does not claim that appellate counsel was ineffective for not raising the juror claim on direct appeal. Instead, he raises the merits of the claim for the first time in this habeas petition. However, habeas corpus is not a second appeal and cannot be used to litigate issues which could have been or were raised on direct appeal.
 
 See, e.g., Breedlove v. Singletary,
 
 595 So.2d 8, 10 (Fla.1992). Thus, this substantive claim on the jurors’ excusal is procedurally barred because it should have been raised on direct appeal.
 
 White v. State,
 
 964 So.2d 1278, 1290 (Fla.2007).
 

 Additionally, the juror claim is without merit. Florida Rule of Criminal Procedure 3.300(c) gives the court authority to excuse a juror for cause if, after examination of the juror, “the court is of the opinion that the juror is not qualified to serve as a trial juror.” While a juror cannot be excluded on the basis of not speaking English well, the juror can be excluded based on his or her inability to understand English.
 
 See Cook v. State,
 
 542 So.2d 964, 970 (Fla.1989) (“[I]t is the ability to understand English rather than to speak it perfectly which is important.”). As we stated in
 
 Cook,
 

 There is hardly any area of the law in which the trial judge is given more discretion than in ruling on challenges of jurors for cause. Appellate courts consistently recognize that the trial judge who is present during voir dire is in a far superior position to properly evalu
 
 *959
 
 ate the responses to the questions propounded to the jurors.
 

 Id,
 
 at 969.
 

 As reflected in the transcript of voir dire questioning at Pagan’s trial, the judge explained to the parties that he would question those individuals who required individual questioning. If he intended to excuse them, the judge would ask the parties if they had any objections to the excusal. If he did not intend to excuse them, he would ask the parties if they had any questions. In two instances, prospective jurors stated that they did not speak English well. The judge explained to each of the men that she was not concerned with how well they could speak English, but how well they understood it. Each man responded that he had difficulty understanding what the judge was saying. Neither the State nor defense counsel voiced objections to excusing the two men. This record reflects no abuse in the trial court’s handling of this matter.
 

 Finally, Pagan claims that in light of
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the jury instructions violated the principles of
 
 Caldwell v. Mississippi
 
 because they diminished the jury’s true role in his death sentence. We have held that
 
 Ring
 
 does not apply retroactively to defendants whose convictions were final when the decision was rendered.
 
 See Johnson v. State,
 
 904 So.2d 400 (Fla.2005). Further, we have repeatedly rejected objections based on
 
 Caldivell
 
 to Florida’s standard jury instructions.
 
 See Mansfield v. State,
 
 911 So.2d 1160, 1180 (Fla.2005) (denying habe-as relief on claim that death sentence was unconstitutional under
 
 Ring
 
 and
 
 Cald-ivell ); Sochor v. State,
 
 619 So.2d 285, 291 (Fla.1993);
 
 Turner v. Dugger,
 
 614 So.2d 1075, 1079 (Fla.1992). Thus, Pagan is not entitled to habeas relief on this claim.
 

 CONCLUSION
 

 For the reasons expressed above, we affirm the trial court’s denial of postconviction relief and we deny Pagan’s petition for habeas relief.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 LABARGA and PERRY, JJ., did not participate.
 

 [1]
 

 . Co-perpetrator Willie Graham was convicted of the same charges in a separate trial and sentenced to life in prison.
 

 [2]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [3]
 

 . Pagan asserted that (1) there was insufficient evidence presented at trial to sustain his conviction and to support the trial court's denial of his motion for judgment of acquittal; (2) the trial court improperly admitted collateral crime evidence under
 
 Williams
 
 v.
 
 State,
 
 110 So.2d 654 (Fla.1959); (3) the trial court erred in denying Pagan's motion to suppress physical evidence; (4) the trial court erred in refusing to grant a new trial or to declare a mistrial when the prosecutor improperly bolstered the credibility of a state witness; (5) the trial court erred in admitting recorded hearsay; (6) the trial court erred in denying Pagan's motion for a new trial and in upholding the State’s challenge to a juror; (7) the trial court abused its discretion in reviewing Pagan’s motion for mistrial and therefore erred in refusing to order a new trial; (8) the trial court erred in refusing to grant one or more of Pagan's motions for a mistrial; (9) the trial court erred in permitting the showing of photographs of the deceased; (10) the trial court erred in denying Pagan's motion for a new trial based on a discovery violation when testimony concerning a voice lineup was permitted; (11) the trial court erred in denying Pagan’s motion for mistrial when the
 
 *945
 
 prosecutor made an improper golden rule argument in closing argument; (12) the trial court erred in denying Pagan’s motion for mistrial when the prosecutor in closing argument referred to a camouflage jacket from the Desert Storm military campaign which was not in evidence and which was highly prejudicial; (13) the trial court erred in permitting Keith Jackson to testify about the death of the six-year-old child victim; (14) the trial court erred in overruling objections and permitting the medical examiner to express expert opinions on the properties of glass; (15) the trial court erred in granting the State's motion for a voice lineup and in allowing testimony relating to the voice lineup to be admitted at trial; (16) these cumulative errors required reversal and remand; and (17) Pagan’s death sentence was not proportionate.
 
 Pagan,
 
 830 So.2d at 802-03.
 

 [4]
 

 .The evidentiary hearing concerned Pagan’s claims that the State committed a violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing evidence about the identity of an alternate suspect purportedly contained in a police report; that defense counsel provided ineffective assistance by failing to ensure that Pagan received a proper mental health examination, by failing to conduct a proper investigation of mitigation, by failing to present mitigation evidence properly, and by failing to call witnesses who could mitigate the facts of the prior violent felony aggravator; and that Pagan was denied his rights under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), because counsel failed to ensure a proper mental health examination and failed to provide necessary information to the mental health expert.
 

 [5]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [6]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [7]
 

 .
 
 Caldwell v. Mississippi,
 
 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
 

 [8]
 

 . The court granted an evidentiary hearing on four of Pagan's postconviction issues. Pagan only raises three of those issues in this appeal.
 

 [9]
 

 . The statule provides, in pertinent part, that mitigating circumstances shall include “[t]he existence of any other factors in the defendant's background that would midgate against the imposition of the death penalty.” § 921.141(6)(h), Fla. Stat. (1997).
 

 [10]
 

 .
 
 Giglio v. United Stales,
 
 405 U.S. 150, 153-54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [11]
 

 .
 
 Williams v. Slate,
 
 110 So.2d 654 (Fla.1959).
 

 [12]
 

 . Jackson was actually rcarrested on diese charges in 1995.
 

 [13]
 

 . Counsel elicited that Miller was Jackson's cousin and gave Jackson information that the victim Freddy Jones was a drug dealer who purportedly kept lots of money in his house.
 

 [14]
 

 . Mosley was dating Jackson’s cousin Miller and had a personal grudge against surviving victim Latasha Jones.
 

 [15]
 

 . Graham and Jackson were close friends and had been charged as codefendants in an attempted murder in Dade County.
 

 [16]
 

 .The statute provides, in pertinent part:
 

 (1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.
 

 § 90.504(1), Fla. Stat. (2007).